1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHEILA WATTS, an individual,<br><br>                           Plaintiff,<br><br>        vs.<br><br>METROPOLITAN LIFE INSURANCE COMPANY, SYSTEMS INTEGRATION & MANAGEMENT WELFARE BENEFIT PLAN, SYSTEMS INTEGRATION & MANAGEMENT, INC.,<br>                           Defendants. | CASE NO. 09cv829 WQH (WVG)<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

HAYES, Judge:

The matter before the Court is the Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.      Findings of Fact

This is an action for disability benefits under the Employee Retirement Income Security Act of 1974 ("ERISA").  Plaintiff Sheila Watts ("Watts") stopped working on July 28, 2005, and submitted a claim for short term disability benefits under a group insurance policy which was approved by Defendant Metropolitan Life Insurance Company ("MetLife").  On October 25, 2005, Plaintiff's claim for long term disability benefits was approved by MetLife.  Plaintiff received benefits for two years.  On October 23, 2007, MetLife notified Plaintiff that she was no longer eligible for disability benefits.  Plaintiff's

benefits were subsequently terminated and Plaintiff appealed.  On January 22, 2008, MetLife upheld the termination of Watts's long-term disability benefits on appeal. On April 6, 2008, Plaintiff was awarded Social Security Disability Benefits retroactive to January 2006.  On April 20, 2009, Plaintiff initiated this action.  On June 12, 2009, MetLife filed a counterclaim seeking to recover overpayments due to the retroactive Social Security Disability Benefits award.

On December 17, 2010, the Court conducted a bench trial.

**A.     Governing Policy and Plan**

Defendant MetLife issued a group insurance contract, Group Policy TM 05576760-G ("Policy"), to Systems Integration & Management effective May 1, 2004, to provide disability coverage to all full time active employees.

The Policy states:

> **Definition of Disability** "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis and you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy.
>
> Your loss of earnings must be a direct result of your sickness, pregnancy or accidental injury.  Economic factors such as, but not limited to, recession, job obsolescence, paycuts and job-sharing will not be considered in determining whether you meet the loss of earnings test.
> ...
> "Own Occupation" means the activity that you regularly perform and that serves as your source of income.  It is not limited to the specific position you held with your Employer.  It may be a similar activity that could be performed with your Employer or any other employer.

(ECF No. 22-17 at 33).

The Policy requires that "you must provide documented proof of your Disability" and "proof of continuing Disability."  *Id*. at 44-45.  The Policy provides procedures for presenting claims for benefits and appealing the initial determination.  The Policy provides that benefits end on "the date you are no longer Disabled."  *Id*. at 32.

The Policy states, "**Long Term Disability Benefits** - **Monthly Benefit**: 60% of your Predisability Earnings, but not more than the Maximum Monthly benefit below

[$5,000], reduced by Other Income Benefits." *Id.* at 28.  The Policy provides that the "Monthly Benefit is reduced by Other Income ...." *Id.* at 36.  The Policy provides a "List of Sources of Other Income Benefits" which includes benefits under the "Federal Social Security Act." *Id.* at 36.  The Policy provides

> We have the right to recover from you any amount that we determine to be an Overpayment.  You have an obligation to refund to us any such amount.... An Overpayment occurs when we determine that the total amount paid by us on your claim is more than the total of the benefits due under This Plan.  This includes any Overpayment resulting from: (1) retroactive awards received from sources shown on the List of Other Income Benefits.

*Id.* at 46.

The Policy provides:

> **Discretionary Authority of Plan Administrator and Other Plan Fiduciaries** - In Carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan Fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for an entitlement to Plan benefits in accordance with the terms of the Plan.  Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(ECF No. 22-18 at 7).

**B.      Medical Evidence**

Watts is a 42-year-old woman who was employed as a financial analyst for Systems Integration & Management, Inc.

On July 28, 2005, Dr. Rudolf Herzog, internist, advised Watts to stop working due to her diagnoses of lupus (autoimmune disease) and fibromyalgia (disorder characterized by widespread musculoskeletal pain) and noted that her other conditions included chronic pain, thromboembolism (blood clots), and aseptic necrosis (bone death) of the hips.  Watts stopped working on that day.  Dr. Herzog noted that Watts had slight psychological limitations and that she was able to function in most stressful situations and engage in some interpersonal relations.  Dr. Herzog opined that Watts was able to sit for one hour continuously, that Watts was unable to stand or walk continuously, that Watts could lift up to 10 pounds occasionally, and that Watts could not perform repetitive finger, eye, or

push/pull movements.  Dr. Herzog estimated that Watts could return to any occupation, part-time work as of February 1, 2006.  Watts applied for and received short-term disability benefits from MetLife.

On September 20, 2005, MetLife notified Watts that her short-term disability benefits were nearing the maximum time allowed under the plan, and that her file was referred to the long-term disability case manager for benefits review.  On October 11, 2005, Watts was asked to complete a personal profile.  In the personal profile, Watts described her medical condition, treatment, and social activity.  Watts submitted a copy of her résumé which contained a narrative description of her work experience.

On October 25, 2005, MetLife notified Watts that she was approved for long-term disability benefits.  MetLife requested that Watts apply for Social Security Disability benefits and explained that an award may reduce her long-term disability benefits or a retroactive award may require reimbursement.  MetLife also advised that it would "periodically require updated medical certification for [her] claim."  (ECF No. 22-16 at 41).

On April 25, 2006, MetLife requested proof of that Watts had applied for Social Security benefits, "[i]n order to continue the evaluation of [her] claim...."  (ECF No. 22-15 at 47).

On April 26, 2006,  Dr. Corrie Broudy examined Watts and diagnosed her with a urinary tract infection, autoimmune polyneuropathy, aseptic necrosis of the bone, overlap syndrome (autoimmune disease of connective tissue), fibromyalgia, irritable bowel disease, migraine headaches, diffuse esophageal spasm (uncoordinated contractions of the esophagus), and pulmonary embolism.  Dr. Broudy prescribed trigger-point injections (anesthetic injections in painful areas of muscle), exercise, massage, physical therapy, and tens unit (electric current to stimulate nerves).  Dr. Broudy also noted that other than slight malar flush of the skin (color caused by reduced oxygen concentration), Watts's respiratory, cardiovascular, abdominal, extremities, and neurological examinations were normal.  X-rays of Watts's head and chest revealed no acute disease, no evidence of pulmonary emboli (blockage in lung), and moderate bilateral ethmoid sinus disease.

Watts's bone density was tested and it was found to be normal.  Chemical tests revealed

moderate levels of bacteria and normal complete blood count ("CBC") morphology.

On May 4, 2006, MetLife notified Watts that it had recently reviewed her claim and

would need information from her physician to "consider" her benefits.  (ECF No. 22-15 at

41).  MetLife requested copies of her most recent office notes, diagnosis test results,

operative reports and discharge summaries, if applicable, rehabilitation therapy notes, if

applicable, names and doses of all current medications, functional abilities, and expected

return to work date to be provided by May 18, 2006.

On May 15, 2006, Plaintiff's physician Dr. Herzog submitted patient records for

Watts and stated, "I decline, however, to further make any evaluation with regard to her

functional abilities and return to work date.  I am not qualified to make these

determinations and would suggest that you refer the patient to one of your own contracted

physicians to appropriately make these determinations."  (ECF No. 22-13 at 27).  The

patient records contained notes from examinations performed on June 21, 2006, August 25,

2006, September 19, 2006, and October 3, 2006.  Dr. Herzog diagnosed Watts with Lupus,

avascular necrosis, probable cervical radiculopathy (herniated disk), 2+ pitting edema

(swelling) of the foot, probable cellulitis (skin infection), and pulmonary embolism.

On August 30, 2006, Watts was hospitalized and treated for "multiple skin changes

secondary to underlying recurrent infection as well as IV induced cellulitis."  (ECF No. 22-

14 at 11).  Watts was diagnosed with cellulitis of the left foot following trauma and

cellulitis on both arms at the trigger-point injection sights, as well as chronic immune

suppression and lupus.  Dr. Gardner noted that Watts was "fairly immune suppressed and

had chronic lupus" but the cellulitis "appeared to be improving on broad spectrum

antibiotic therapy ...."  *Id*.  Dr. Gardner found that Watts had no acute pulmonary disease,

no evidence of active cardiopulmonary disease, reasonably normal arterial supply to the

lower extremities with diffuse plaque, low probability of pulmonary embolism, and

noninvasive venous profile in the left upper extremity which was negative for acute deep

vein thrombosis (blood clots) but thrombosis was noted in the superficial vein.

On October 4, 2006, MetLife notified Watts that it needed additional medical information to support her disability claim.  On October 10, 2006, Watts submitted additional information including a letter submitted by Dr. Broudy which stated:

> Ms. Watts is a 37 year old woman with a very complicated history. She has had Raynaud's phenomenon since age 16, systemic lupus with recent flare several months ago, and pulmonary embolism in 2003. She has required chronic anticoagulation [prevents blood clotting]. As a consequence of her lupus and chronic steroid therapy, the patient has developed avascular necrosis [bone death] of the femoral heads. She has excruciating hip pain that makes walking and standing difficult. I have sent her for orthopedic consultation. Ms. Watts also has fibromyalgia syndrome and has intractable total body pain. She is currently on Elavil and is seeing Dr. Oleg Gavrilyuk, PMR, for trigger point injections on a monthly basis.

(ECF No. 22-14 at 21, 23).

On October 10, 2006, Watts's former employer completed a Disability Claim Employee's Job Description which stated that the physical requirements of Watts's job included sitting for 7 to 8 hours, standing and walking for 3 to 4 hours, and twisting, reaching above shoulder, crouching, stooping, kneeling and balancing for 1 to 2 hours of a work day.  The Disability Claim Employee's Job Description form stated that there was occasional lifting of up to 50 pounds.  The Disability Claim Employee's Job Description form stated that there was no repetitive use of the hands or feet as well as no grasping, no fine finger dexterity and no use of the head and neck in either a static, twisting or looking up or down position.

From October 23, 2006 through October 25, 2006, surveillance of Watts was conducted by an investigator hired by MetLife which showed Watts out of her home for a total of 3 ½ hours. Watts was observed driving, carrying bags, and performing errands.

On January 12, 2007, Dr. Herzog submitted a letter to MetLife in which he stated:

> Watts has a long history of systemic lupus, ostero-arthritis [joint disorder], and polyneuropathy [nerve disorder].... she has also been diagnosed with avascular necrosis [bone death] of the hip. In July of 2005 she went on disability due to these medical problems which persist today and will be responsible for any number of other complications in the future.  Due to the painful nature of these diagnoses and the fact that there is no cure for lupus Ms. Watts's ability to return to work is not likely.

(ECF No. 22-12 at 37).

On January 19, 2007, Watts underwent a rheumatological examination by Dr. Roger Kornu.  Dr. Kornu diagnosed Watts with overlap syndrome (autoimmune disease of connective tissue), fibromyalgia, urinary tract infection, autoimmune polyneuropathy, aseptic necrosis of bone, irritable bowel disease, migraine headaches, diffuse esophageal spasm, and pulmonary embolism (blockage in lung).  On January 22, 2007, an MRI was performed on Watts's spine which revealed "mild multilevel degenerative change in the lower lumbar spine without evidence of significant canal stenosis [narrowing] or formal narrowing."  (ECF No. 22-10 at 50).

On January 25, 2007, Plaintiff's physician Dr. Oleg Gavrilyuk administered trigger-point injections at the L4-L5 (lumbar vertebrae) muscle site.

On March 1, 2007, an MRI was performed on Watts's brain which revealed "minimal paranasal sinus disease."  (ECF No. 22-11 at 15).

On March 31, 2007, Dr. Gavrilyuk administered trigger-point injections at the L4-L5 (lumbar vertebrae) muscle site.

From April 10, 2007 through April 12, 2007, surveillance of Watts was conducted by an investigator hired by MetLife which showed that Watts was out of her home for a total of 4 1/4 hours.  Watts was observed driving, walking "up stair," and performing errands.  (ECF No. 22-11 at 24).

On May 9, 2007, a claims specialist for MetLife contacted the employer representative at Watts's prior employer, Systems Integration & Management, who gave a verbal description of Watts's position which included, "6-8 [hours] on computer, worked on excel spreadsheets, balanced books. Occasional phone to research information. Rarely, on occasion, [employee] would have to go to storage rooms for old records, therefore would have to lift boxes to get to the old records."  (ECF No. 22-2 at 6).

On May 21, 2007, Dr. Kornu completed a "Lupus physical residual functional capacity questionnaire" and opined that Watts was likely to be absent from work an average of four days per month, and Watts was incapable of even a low stress job.  (ECF No. 22-9 at 47).  Although the form contained questions regarding Watts's ability to stand,

walk, sit, perform fine finger manipulation, and lift weight, Dr. Kornu did not complete these sections of the form.

On May 23, 2007, Dr. Herzog completed a physical residual functional capacity questionnaire and opined that Watts could sit for 20 minutes, stand for 10 minutes, and walk for 5 minutes at a time in an eight-hour workday. Dr. Herzog opined that Watts could lift less than 10 pounds rarely. Dr. Herzog opined that Watts could perform fine finger manipulation for 10 percent of a workday. Dr. Herzog noted that "per patient" Watts was incapable of performing even a low stress job. (ECF No. 22-10 at 7-9).

On May 31, 2007, Dr. Gavrilyuk completed a physical residual functional capacity questionnaire and opined that Watts could sit for 10 minutes, stand for 10 minutes, and walk for 10 minutes at a time in an eight-hour workday. Dr. Gavrilyuk opined that Watts could lift 10 pounds rarely and lift less than 10 pounds occasionally. Dr. Gavrilyuk opined that Watts could perform fine finger manipulation for 90 percent of a workday. Dr. Gavrilyuk opined that Watts could not perform even a low stress job.

From June 24, 2007 through June 26, 2007 surveillance of Watts was conducted by an investigator hired by MetLife which showed Watts was out of her home for a total of 11 ½ hours. Watts was observed driving, walking on the beach for approximately two minutes, carrying bags, and performing errands.

MetLife hired Dr. Adrian M. Jaffer, specialist in rheumatology, allergy, and asthma, to perform an independent medical evaluation of Watts. On July 17, 2007, Dr. Jaffer examined Watts. Dr. Jaffer listed Watts's chief complaints, the history of her present illness, reviewed her systems, noted her medications and drug allergies, noted her past surgical history, family history, and social history and performed a physical examination and chart review. As part of the physical exam, Dr. Jaffer found that Watts:

> is clearly cushingold [symptomatic of Cushing's syndrome, a hormone disorder] with large lat pads [fat pads] over parotids [salivary glands].... She has a lot of muscle spasm and tenderness in the posterior neck.... Abdomen is difficult to palpate because of her weight but there is no obvious organomegaly [abnormal enlargement of organs] or lymphadenopathy [disease of lymphnodes].... left hip appears limited in movement, particularly external rotation.... It is difficult to say whether [right] is limited.... Skin shows a mild

1    butterfly-distribution rash.

2    (ECF No. 22-9 at 13).  The physical examination revealed normal results in the following

3    aspects: ears, nose, mouth, glands, lymphodes, spine, lungs, heart, joints, grip strength,

4    thumbs, wrists, elbows, shoulders, feet, ankles, knees, musculature, walking, getting up out

5    of a chair, cognition, recall, and affect.

6            Dr. Jaffer diagnosed Watts with the following: "(1) connective tissue disease, lupus

7    most likely. (2) recurrent chest pain. (3) musculoskeletal pain syndrome. (4) fatigue. [and]

8    (5) avascular necrosis of the hips, by x-ray."  (ECF No. 22-9 at 12-13).  Dr. Jaffer opined

9    that Watts had experienced "a limited form of systemic lupus where she appears to have

10   had mainly mild skin and significant joint involvement although no x-rays of her hands are

11   available and she does not have the classical deformities associated with long-term lupus

12   arthopathy [joint disease]."  *Id.* at 13.  Dr. Jaffer found that Watts had recurrent chest pain,

13   but he could not determine the etiology, and stated, "One might term it a pleurisy

14   [inflammation of lungs and chest] but it does not seem to correlate to lupus flares.  It is

15   much more prevalent and repeated x-rays and CT scans have not shown evidence of

16   recurrent pulmonary emboli [blockage], effusion [excess fluid], serositis [inflammation] or

17   other signs of an obvious connective tissue disease affecting her lung although that cannot

18   be excluded."  *Id.*  Dr. Jaffer found that Watts's hip pain "seems to relate to a chronic

19   tendinitis/bursitis [inflammation] presumed secondary to avascular necrosis which of

20   course is a significant limiting problem and apparently x-ray proven."  *Id.*  Dr. Jaffer noted

21   that Watts complained of musculoskeletal pain which "appeare[d] to have classic

22   correlation with fatigue, insomnia, and irritable bowel syndrome probably is a result of

23   multiple factors that cannot be further analyzed."  *Id.* at 13-14.  Dr. Jaffer found that

24   Watts's "other problems are Iatrogenic [caused by] steroids, Cushing's disease, presumed

25   contribution to her avascular necrosis and accelerated atherosclerosis [collection of fatty

26   materials in arteries]."  *Id.* at 14.

27           Dr. Jaffer concluded:

28           At this point in time I think Watts's problems ... [are] mostly
             subjective, that significantly seem to impact her emotionally and,

1
2
3
4
5
6

according to her, physically.  She clearly is capable of daily activities of living.  She is functioning reasonably well in her environment according to the written transcripts of her surveillance.  I have reviewed her job description.... [I]n a physical sense this patient is probably capable of the work that is described within her worksheet. Certainly, she can sit at a desk with periods of getting up to stretch.  I believe she could stand for a couple of hours a day and function reasonably well in a physical environment.  Whether given the total number of her problems which are extensive ... this would allow her to function within the average stress of a workplace is unknown to me on one examination and cannot be further commented on.

7  *Id.*

8       On July 25, 2007, Watts was admitted to Scripps Mercy Hospital and treated for

9  cellulitis (skin infection) with antibiotics.  An MRI was performed on her foot and it

10  revealed a "nondisplaced fracture of the third metatarsal bone rather than osteomyelitis

11  [bone infection]."  (ECF No. 22-6 at 48).

12       On August 21, 2007, MetLife provided plaintiff's treating physician Dr. Herzog

13  with a copy of Dr. Jaffer's report and stated, "[t]his report indicates that your patient would

14  be able to perform in her job."  (ECF No. 22-9 at 3).  MetLife requested a response and

15  stated "[i]f we do not receive a response ... we will assume you agree with [Dr. Jaffer's]

16  report ...."  *Id.*

17       On September 19, 2007, MetLife provided plaintiff's treating physician Dr.

18  Gavrilyuk and with a copy of Dr. Jaffer's report, the surveillance videos, Watts's functional

19  job description, and stated, "[i]t appears that [Watts] is fairly active in the community...

20  [t]here is no detection of an antalgic gait (painful walking) or difficulty getting into and out

21  of a car, squatting, bending, to negotiating stairs."  (ECF No. 22-8 at 48).  MetLife

22  requested Dr. Gavrilyuk "provide [his] clinical input ... for [MetLife's] understanding of

23  [Watts's] disability associated with her occupation."  *Id.*  MetLife stated, "[i]f we do not

24  receive a response from you ... we will assume that you agree with the activity and [Dr.

25  Jaffer's] report ...."  *Id.*

26       **C.    Termination of Benefits**

27       On October 23, 2007, MetLife notified Watts that it had concluded that she was no

28  longer eligible for long-term disability benefits because her "medical records no longer

support a severity of impairment that would preclude [her] from a return to work in [her]

own occupation." (ECF No. 22-8 at 44). The letter also provided a "summary of

[MetLife's] Vocational Rehabilitation review" and stated: "Own Job Title: Analyst - per

job description on file, demand is medium because of lifting 50 lb. occasionally required.

*Id.* at 45. The letter stated:

> There is no narrative description on file, however, according to the resume you provided your duties include: provides financial and programmatic support to clients, reconciles and resolves financial discrepancies, provides meeting support and client briefings, [a]ssists the program manager providing administrative and financial support, maintains and tracks expenditures on existing contracts, prepares briefs, receives calls or visitors, arranges conferences, meetings and travel accommodations[, and i]s responsible for a wide range of routine (day-to-day) bookkeeping and accounting procedures.

*Id*. MetLife quoted Dr. Jaffer's report which states, "in a physical sense this patient is

probably capable of the work that is described in her worksheet ... certainly she can sit at a

desk with periods of getting up simply to stretch ... she could stand for a couple hours a

day." *Id*. MetLife determined that Watts's own occupation under the Dictionary of

Occupational Titles code was administrative assistant which is classified as sedentary work.

The letter concluded: "According to the [independent medical exam] physician [Dr. Jaffer]

the claimant is capable of sedentary work; therefore she is able to perform the essential

tasks of her occupation as well." *Id*. at 46.

The letter referenced Watts's medical record by stating as follows: "The medical

information reviewed to make this determination was extensive. A thorough review and

evaluation of all medical information received from you and your physicians, along with

other documentation contained in your file (sic)." (ECF No. 22-8 at 44). MetLife noted

that it had previously sent copies of the surveillance video, Watts's job description, and Dr.

Jaffer's report to Dr. Herzog and Dr. Gavrilyuk and "[i]t was explained that if they chose

not to comment on the information it would be assumed that they agree." *Id*. at 46.

MetLife stated, "Dr. Herzog's office was called ...[and] their comment was only that they

would not comment and to send the information to Dr. Gavrilyuk." *Id*. MetLife stated,

"Dr. Gavrilyuk has still not responded, therefore, we assume he is in agreement with

1  [MetLife's] findings." *Id.*

2        MetLife advised Watts that she would need to provide the following for further

3  consideration of her benefits: "(1) Clinical evidence to support that [she is] incapable of

4  performing work in [her] own occupation.  (2) Clinical evidence of an exacerbation of a

5  rheumatologic condition to include lab tests, physical examination and diagnostic tests to

6  show a disabling medical condition.  (3) Restrictions and limitations provided from [her]

7  physician stating that [she is] incapable of working in [her] own occupation." *Id.*

8        On October 23, 2007, the same day Watts received notice that MetLife had

9  concluded she was no longer eligible for long-term disability benefits, Watts appealed

10 MetLife's determination.  On November 6, 2007, Watts was given an extension of time to

11 provide evidence supporting her appeal.  Watts submitted additional medical records.

12 Watts provided a letter from Dr. Gavrilyuk which stated:

13          I feel that the patient's lupus, septic necrosis of her femurs, as well
            as fibromyalgia have been very well documented.  The fact that the
14          patient was videotaped at the time that she showed no significant
            disability might mean that she had a relatively pain-free period
15          during her condition which are known to not always be the case
            during the waxing and waning course of the above-mentioned
16          conditions.  At this point I cannot make my final judgment regarding
            her disability because it is not my expertise; but as a clinician, I
17          strongly feel that Ms. Watts might have symptoms associated with
            disability and she needs appropriate adjustment in her lifestyle and
18          activities of daily living.

19 (ECF No. 22-8 at 39).

20       Watts also submitted a letter from Dr. Roger Kornu which stated:

21          I have been following Ms. Watts for significant and active systemic
            [lupus].  She is on active therapy, but she has not had the clinical
22          response yet that we would have liked.  Her fatigue decreases in (sic)
            mental acumen, and arthritis which is directly related to her lupus
23          makes it not possible to return to work as a financial analyst doing a
            40 hour work week.  She is able to drive and walk, but what limits
24          her is the consisten[cy] of the work.  There are (and will continue to
            be) days where she will not be able to get out of her house and bed
25          because of her condition.  Therefore, I feel she is disabled from full
            time work at her current work place.
26
*Id.* at 38.
27
           **D.     MetLife's Review of Appeal**
28
           On December 14, 2007, Dr. D. Dennis Payne, certified in internal medicine and

rheumatology, reviewed Watts's medical records, attempted to contact Dr. Herzog, Dr.

Kornu, and Dr. Gavrilyuk to discuss the case, and noted that he was unable to contact them.

Dr. Payne did not perform an examination on Watts.  Dr. Payne performed a paper review

of the record and issued a report in which he found that Watts had

> a history of lupus ... [and] was diagnosed based on the presence of
> joint pain with abnormal serology [blood test].  There are also
> reports of her having neuropathic pain and a history of aseptic
> necrosis of both hips as well as reported aseptic necrosis of the
> femoral condyle on the knee but I am currently unsure of the side
> involvement.  There is mention of fibromyalgia syndrome ... [which]
> has reportedly produced diffused and widespread musculoskeletal
> pain.  There is mention of her having inflammatory joint disease in
> the histories, but minimal features are actually described in the
> historical information ...there is also mention of her having a
> pulmonary embolus [blockage of lung] in 2003.... I see that she was
> hospitalized in July of this year for a possible osteomyeltis [bone
> infection].  Following further evaluation at that time a diagnosis of a
> third metatarsal fracture was made.... There is also a mention of her
> having a similar infectious type process ... [s]he received intravenous
> antibiotics ...I see no long-term sequelae [pathological condition] in
> the historical information documenting any problems resulting from
> the infection.

 (ECF No. 22-6 at 18).

Dr. Payne observed that there was an independent medical evaluation performed on

Watts by Dr. Jaffer and stated: "The determination of the rheumatologist [Dr. Jaffer] was

that Ms. Watts was capable of full time sedentary work."  *Id*.  Dr. Payne also noted the

presence of video surveillance. Dr. Payne listed Watts's work-up data which included

normal results from the following: a CBC (complete blood chemistry) chemistry profile

which included the C3 and C4 compliment (proteins tested for indications of autoimmune

disease), a CT of the chest, an EKG, lower extremity arterial duplex study (arterial

evaluation), and an SM rheumatoid factor.  Dr. Payne noted that an MRI of the lumbar

spine revealed mild degenerative disk and joint disease, a CT of the head revealed mild

sinus disease, an MRI of the hips revealed evidence of avascular necrosis, an MRI of the

right ankle revealed small effusion (excess fluid) and subtle degenerative change in the

talonavicular joint (ankle), a V-Q scan revealed low probability for pulmonary embolism

(blockage of lung), a RNP was positive for antihistone antibodies, a nerve conduction

revealed mild sensory neuropathy (nerve damage) in the lower left extremity, and a DEXA

1   scan revealed osteopenia (low bone mineral density).  Dr. Payne also noted results of

2   examinations and medical records which "report the presence of essentially normal exam

3   on most determination." *Id*. at 18.  Dr. Payne opined: "Based on the presence of the

4   avascular necrosis of the hips and possibly medial femoral condyle of one knee, ... her work

5   abilities should be limited to light by DOT physical demands.  I do not see any other

6   objective abnormalities necessitating restrictions and limitations." *Id*. at 19.

7         On December 28, 2007, MetLife sent Dr. Payne's report to Dr. Herzog, Dr. Kornu

8   and Dr. Gavrilyuk for their review and comment.  Plaintiff's attorney  requested an

9   extension of time for the doctors to respond which was granted.  Dr. Gavrilyuk responded

10  by submitting his physical residual functional capacity questionnaire dated May 31, 2007

11  and his fibromyalgia residual functional capacity questionnaire dated May 30, 2007.  Dr.

12  Kornu responded by repeating his earlier letter and adding: "She has had some response to

13  therapy as we have been able to maximize her Cellcept [immunosuppressant medication]

14  and have been able to titrate down [decrease dosage] on prednisone [immunosuppressant

15  medication].  Although she has made improvements which is encouraging, I still feel she

16  needs to be on work disability."  (ECF No. 22-5 at 39).

17        On January 22, 2008, MetLife notified Watts that it was upholding the termination

18  of her long-term disability benefits.  MetLife stated that "an independent medical

19  examination performed by a rheumatologist [Dr. Jaffer] ... found [Watts] capable of

20  performing sedentary work and a vocational analysis determined [that] Ms. Watt[s's] own

21  occupation was sedentary." *Id*. at 36.  MetLife also explained that Dr. Payne reported that

22  Plaintiff's examinations and reports presented "essentially normal" results.  *Id*.  MetLife

23  cited Dr. Payne's report as finding:

24        [Watts's] hip motion is described as normal throughout all exams.  A
          malar rash is intermittently mentioned over the past three years.
25        There was no discoid lesions [inflammatory skin disorder] or
          alopecia [loss of hair] noted and there is not mention of oral ulcers....
26        [T]here is mention of [Watts] having some mild swelling in the
          hands and feet without clear inflammatory features.  In March 2007,
27        there were some features of synovitis [inflammation] in several PIP
          joints mentioned.... [T]here are no notations of any lower extremity
28        musculoskeletal findings and cardiac, pulmonary, gastrointestinal,
          neurological exams are repeatedly normal throughout all of

1  examination data.

2  *Id*. Metlife stated that "[b]ased on review of her file by an independent Physician

3  Consultant [Dr. Payne], it is determined [that Watts] would be capable of performing a light

4  duty job." *Id*. at 37.  Met Life stated, "Watts's own job is considered to be light, due to the

5  lifting requirement and her own occupation is considered to be sedentary." *Id*.  MetLife

6  concluded: "Therefore, [Watts] is not considered disabled from her own occupation." *Id*.

7  MetLife also stated that Plaintiff Watts had the right to bring an ERISA civil action, but

8  that "[Watts had] exhausted [her] administrative remedies under the plan and no further

9  appeals [would] be considered." *Id*.

10         The January 22, 2008, letter upholding the termination of benefits on appeal did not

11  comment on Plaintiff's medical record or the opinions of Plaintiff's treating physicians.

12  MetLife noted that its independent physician consultant Dr. Payne had attempted to contact

13  Dr. Herzog, but "[t]he consultant [Dr. Payne] was advised that Dr. Herzog had nothing to

14  add with respect to determination of disability and functional abilities and further stated

15  that he was deferring these determinations to other consultants ...." *Id*. at 36. MetLife

16  stated that Dr. Payne left messages with Dr. Kornu and Dr. Gavrilyuk, but never received a

17  return phone call.  MetLife stated that Dr. Payne's report was submitted to Dr. Herzog, Dr.

18  Kornu and Dr. Gavrilyuk for their review and comment.  MetLife stated:

19         Dr. Gavrilyuk replied by sending a questionnaire that was
       completed for Social Security Disability Benefits and also provided
20       a letter stating that Ms. Watts is on active therapy but has not had
       clinical response that was hoped for.  Dr. Gavilyuk stated that she
21       continues with fatigue, decrease in mental acumen, and arthritis that
       is directly related to her lupus.  Dr. Gavrilyuk noted that Ms. Watts
22       can drive and walk but that the consistenly (sic) of the work is what
       limits her.  Dr. Gavrilyuk noted that there are and will continue to
23       be days where she will not be able to get out of her house because
       of her condition.  Although she has made improvements, Dr.
24       Gavrilyuk still feels she is unable to work.  Dr. Gavrilyuk did not
       provide any additional clinical objective findings to support his
25       opinion.

26  *Id*. at 36-37.  The letter concluded that administrative remedies under the plan were

27  exhausted "and no further appeals [would] be considered." *Id*. at 37.

28         On March 31, 2008, Watts was found to be disabled by the Social Security

1   Administration with a disability onset date of July 28, 2005, and she was awarded

2   retroactive benefits of $26,845.00 for the period of January 2006[1] through March 2008.

3        On July 10, 2008, Watts's attorney submitted the Social Security award and

4   additional medical documents to MetLife and requested reconsideration of Plaintiff's claim

5   without limiting the review to "objective abnormalities."  (ECF No. 22-4 at 40-41).  On

6   July 25, 2008,  Watts's attorney submitted a letter to MetLife and again requested re-

7   evaluation of Watts's entitlement to benefits.  (ECF No. 22-4 at 40-41).

8        On October 10, 2008, November 21, 2008, and February 11, 2009, MetLife

9   requested reimbursement of overpayment in the amount of $22,189.32 due to the

10  retroactive Social Security award.  MetLife did not comment on whether or not Watts's

11  award of Social Security Disability Benefits impacted MetLife's claim determination.

12  **II.    Conclusions of Law**

13        **A.    Standard of Review**

14        The Policy and Plan documents unambiguously grant discretionary authority to

15  MetLife, the plan administrator.  Accordingly, the Court reviews MetLife's decision for an

16  abuse of discretion.  *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir.

17  2006) (en banc).[2]

18        Where "the entity that administers the plan, ... both determines whether an employee

19  is eligible for benefits and pays benefits out of its own pocket," this "dual role creates a

20  conflict of interest."  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008).  "[A]

21  reviewing court should consider that conflict [of interest] as a factor in determining whether

22  the plan administrator has abused its discretion in denying benefits; and that (sic) the

---

24   [1]  Although the Social Security Administration found that Watts became disabled on
     July 28, 2005, she did not receive disability benefits until January 2006 because a claimant
25   must "be disabled for 5 full calendar months in a row before [the claimant] can be entitled to
     benefits."  (ECF No. 22-4 at 42).

26   [2]  Plaintiff contends that de novo review is required because Watts did not receive a
27   decision on her request for a second appeal.  The Court applies an abuse of discretion standard
     of review on the grounds that Watts received a decision on her appeal and was not entitled to
28   a second appeal.  *See Porco v. Prudential Ins. Co. of Am.*, 682 F. Supp. 2d 1057, 1073-73
     (C.D. Cal. 2010) ("Nothing in the statutory or regulatory structure of ERISA, however, gives
     [plaintiff] a right to file a second appeal before proceeding in district court ....").

significance of the factor will depend upon the circumstances of the particular case." *Id.*; *see also Abatie*, 458 F.3d at 965 ("[T]he existence of a conflict of interest is relevant to how a court conducts abuse of discretion review."). "Simply construing the terms of the underlying plan and scanning the record for medical evidence supporting the plan administrator's decision is not enough, because a reviewing court must take into account the administrator's conflict of interest as a factor in the analysis." *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009) (citing, *inter alia*, *Glenn*, 554 U.S. at 108; *Abatie*, 458 F.3d at 968-69).

In *Montour*, the court stated:

> [T]he [reviewing] court must consider numerous case-specific factors, including the administrator's conflict of interest, and reach a decision as to whether discretion has been abused by weighing and balancing those factors together. Under this rubric, the extent to which a conflict of interest appears to have motivated an administrator's decision is one among potentially many relevant factors that must be considered. Other factors that frequently arise in the ERISA context include the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts with all of the relevant evidence, and whether the administrator considered a contrary [Social Security Administration] disability determination, if any.
>
> The weight the court assigns to the conflict factor depends on the facts and circumstances of each particular case.... Our court has implemented this approach by including the existence of a conflict as a factor to be weighed, adjusting the weight given that factor based on the degree to which the conflict appears improperly to have influenced a plan administrator's decision....
>
> *Abatie* explained that the court should adjust the level of skepticism with which it reviews a potentially biased plan administrator's explanation for its decision in accordance with the facts and circumstances of the case. If those facts and circumstances indicate the conflict may have tainted the entire administrative decisionmaking process, the court should review the administrator's stated bases for its decision with enhanced skepticism: this is functionally equivalent to assigning greater weight to the conflict of interest as a factor in the overall analysis of whether an abuse of discretion occurred.

*Id.* (quotation and citations omitted).

In *Abatie*, the court stated:

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is

unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history.  A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Abatie*, 458 F.3d at 968-69 (citations omitted).

### B.    Evidence Outside of the Record

"[I]n general, a district court may review only the administrative record when considering whether the plan administrator abused its discretion...." *Abatie*, 458 F.3d at 970.  "In the ERISA context, the administrative record consists of the papers the insurer had when it denied the claim." *Montour*, 588 F.3d at 632 n.4 (quotation omitted).  "The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." *Id*.; *cf. Glenn*, 554 U.S. at 117 ("The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.").

Plaintiff requests that the Court consider exhibits including correspondence between MetLife and Dr. Jaffer and Dr. Payne, a copy of strength category definitions from the Dictionary of Occupational Titles, an article on Cushing's syndrome, additional records from Dr. Jaffer regarding his evaluation of Plaintiff Watts, portions of MetLife's Claim Management Guidelines discussing functional capacity evaluations, MetLife's Independent Physician Consultant File Review Content Expectation, interrogatory responses discussing money paid by MetLife to Medical Consultants Network and Network Medical Review from 2005 to 2008, and portions of MetLife's Claim Management Guidelines discussing Independent Medical Examinations.

While Plaintiff has submitted evidence of correspondence, guidelines, and money

1   paid to Medical Consultants Network, who referred Dr. Jaffer, and Network Medical
2   Review, who referred Dr. Payne, Plaintiff has submitted no evidence that the physicians
3   consistently opined claimants were disabled or that their decisions were arbitrary and
4   capricious.  *See Morris v. Am. Elec. Power Long-Term Disability Plan*, 2010 WL 4244120,
5   at *10 (6th Cir. 2010) ("[C]onclusory allegations of bias with respect to a plan-chosen
6   reviewer, without statistical evidence that the reviewer consistently opined the claimants
7   were not disabled, could not permit a conclusion that relying on that reviewer's opinion
8   was arbitrary and capricious.") (citation omitted).  Plaintiff's evidence of correspondence,
9   guidelines, and money paid to Medical Consultants Network and Network Medical Review
10   does not support the finding that MetLife's reliance on Dr. Jaffer and Dr. Payne's opinions
11   was arbitrary and capricious.

12      Plaintiff has cited cases in which courts found that MetLife abused its discretion,
13   and Defendant cited cases in which MetLife was found not to have abused its discretion.
14   However, a history of biased claims administration is not evidenced by mere citation to
15   specific decisions criticizing claim determinations.  *See Nolan v. Heald Coll.*, Case No. C
16   05-3399 VRW, 2010 WL 1837805, at *15 (N.D. Cal. Aug. 27, 2010); *see also Walker v.*
17   *Metro. Life Ins. Co.*, Case No. CV 09-1178 PSG (AGRx), 2010 WL 1946898, at *14-15
18   (C.D. Cal. May 12, 2010).  The Court concludes that the case citations in which MetLife
19   was found to have abused its discretion do not support a finding that MetLife has a history
20   of biased claims administration.

21      Finally, the items of evidence that Watts contends are missing from the
22   administrative record do not evidence biased claims administration as the Dictionary of
23   Occupational Titles is a book which is publically available, the record contains the reports
24   of Dr. Jaffer, Dr. Payne, and the surveillance, and the record notes the receipt of Plaintiff
25   Watts's second appeal.  Plaintiff's evidence does not support the finding that the
26   administrative record is incomplete.

27      The Court has considered Plaintiff's evidence outside the record solely for the
28   purpose of deciding the nature, extent, and effect on the decision-making process of

1   MetLife's conflict of interest.  The Court concludes that the evidence does not support a

2   finding of biased claims administration.

3   **C.   Medical Evidence**

4   The Court considers "the quality and quantity of the medical evidence[]" in

5   determining whether MetLife abused its discretion.  *Montour*, 588 F.3d at 630.  In this case,

6   on July 28, 2005, Watts was advised to stop working by Dr. Herzog due to her diagnoses of

7   lupus and fibromyalgia, chronic pain, thromboembolism, aseptic necrosis of the hips and

8   slight psychological limitations. On April 26, 2006, Watts received consistent diagnoses of

9   a urinary tract infection, autoimmune polyneuropathy, aseptic necrosis of the bone, overlap

10  syndrome, fibromyalgia, irritable bowel disease, migraine headaches, diffuse esophageal

11  spasm, and pulmonary embolism from Dr. Broudy.  Watts was prescribed trigger-point

12  injections, exercise, massage, physical therapy, and tens unit.  Dr. Herzog performed

13  examinations on Watts on June 21, 2006, August 25, 2006, September 19, 2006, and

14  October 3, 2006 and diagnosed Watts with Lupus, avascular necrosis, probable cervical

15  radiculopathy, 2+ pitting edema of the foot, probable cellulitis, and pulmonary embolism.

16  On August 30, 2006, Watts was hospitalized and treated for "multiple skin changes

17  secondary to underlying recurrent infection as well as IV induced cellulitis."  (ECF No.

18  22-14 at 11).  Dr. Gardner noted that Watts was "fairly immune suppressed and had chronic

19  lupus" but the cellulitis "appeared to be improving on broad spectrum antibiotic therapy

20  ...."  *Id.*  On October 10, 2006, Dr. Broudy stated that Watts has:

21          systemic lupus with recent flare several months ago, and pulmonary
            embolism in 2003.... As a consequence of her lupus and chronic
22          steroid therapy, the patient has developed avascular necrosis of the
            femoral heads. She has excruciating hip pain that makes walking and
23          standing difficult. I have sent her for orthopedic consultation. Ms.
            Watts also has fibromyalgia syndrome and has intractable total body
24          pain.

25  (ECF No. 22-14 at 21, 23).   On January 12, 2007, Dr. Herzog stated:

26          Watts has a long history of systemic lupus, ostero-arthritis, and
            polyneuropathy.... She has also been diagnosed with avascular
27          necrosis of the hip.... Due to the painful nature of these diagnoses
            and the fact that there is no cure for lupus Ms. Watts's ability to
28          return to work is not likely.

(ECF No. 22-12 at 37). On January 19, 2007, Dr. Kornu diagnosed Watts with overlap syndrome, fibromyalgia, urinary tract infection, autoimmune polyneuropathy, aseptic necrosis of bone, irritable bowel disease, migraine headaches, diffuse esophageal spasm, and pulmonary embolism.

On May 21, 2007, Dr. Kornu completed a "Lupus physical residual functional capacity questionnaire," in which he opined that Watts was likely to be absent from work an average of four days per month, and Watts was incapable of even a low stress job. (ECF No. 22-9 at 47). On May 23, 2007, Dr. Herzog completed a physical residual functional capacity questionnaire and opined that Watts could sit for 20 minutes, stand for 10 minutes, and walk for 5 minutes at a time in an eight-hour workday. Dr. Herzog opined that Watts could lift less than 10 pounds rarely. Dr. Herzog opined that Watts could perform fine finger manipulation for 10 percent of a workday. Dr. Herzog noted that Watts was incapable of performing even a low stress job. On May 31, 2007, Dr. Gavrilyuk completed a physical residual functional capacity questionnaire and opined that Watts could sit for 10 minutes, stand for 10 minutes, and walk for 10 minutes at a time in an eight-hour workday. Dr. Gavrilyuk opined that Watts could lift 10 pounds rarely and lift less than 10 pounds occasionally. Dr. Gavrilyuk opined that Watts could not perform even a low stress job.

In viewing the medical evidence in the administrative record, the Court finds that the quality and quantity of the medical evidence supports Plaintiff's claim that, during the own occupation period, Plaintiff was unable to perform the material duties of her job. The quality and quantity of the medical evidence in the record of this case weighs in favor of a finding that MetLife abused its discretion in terminating Watts's benefits.

When a plan administrator has been paying benefits, "in order to find [plaintiff] no longer disabled, one would expect the [medical evidence] to show an improvement, not a lack of degeneration." *Montour*, 588 F.3d at 635; *see also Saffon*, 522 F.3d at 871. MetLife paid disability benefits to Watts for approximately two years before terminating her benefits. There was no evidence in the record that Watts's disability had improved. Over the course of the two years in which Watts was receiving benefits, her doctors

1   consistently diagnosed her with lupus, fibromyalgia, aseptic necrosis of bone, and other

2   medical conditions associated with her primary diagnoses.  Over the course of the two

3   years in which Watts was receiving benefits, her doctors consistently opined that she could

4   not return to work.  The lack of improvement in the medical record weighs in favor of

5   finding that MetLife abused its discretion in terminating Watts's benefits.

6          The denial of benefits may be arbitrary and capricious where it is based on an

7   ambiguous or equivocal medical opinion.  *See McDonald v. Western-Southern Life Ins.*

8   *Co.*, 347 F.3d 161, 170 (6th Cir. 2003) (finding that denial of benefits was arbitrary and

9   capricious where it was based on the independent medical examiner's ambiguous finding

10  that the claimant "might be able to return to work in a very low stress environment on a

11  limited trial basis"); *see also Saffon v. Wells Fargo & Co. Long Term Disability Plan*, Case

12  No. CV04-1237, ODW(RZx)2009 WL 2969687, at *5 (C.D. Cal. Sept. 15, 2009) (finding

13  that the decision to deny benefits was based on ambiguous medical opinions) (citing *Saffon*,

14  522 F.3d at 870-71); *c.f., Killian v. Healthsource Provident Administrators, Inc*., 152 F.3d

15  514, 520 (6th Cir. 1998) (finding that in a denial of coverage for medical care setting, the

16  administrator's decision was not arbitrary and capricious where the "opinions [of

17  independent medical reviewers] were tempered, but they were not ambiguous, and they

18  were not equivocal.").

19         MetLife determined that Watts was no longer disabled from performing her own

20  occupation and based its termination of benefits in large part on the findings of Dr. Jaffer.

21  In a "First Evaluation" report dated July 17, 2007, Dr. Jaffer found that Watts's problems

22  were "mostly" subjective and Watts was "probably capable" of performing the functions of

23  her job "in a physical sense," Dr. Jaffer explicitly withheld opinion as to "[w]ether given

24  the total number of her problems which are extensive ... this would allow her to function

25  within the average stress of a workplace ...."  (ECF No. 22-9 at 12, 14).  Dr. Jaffer's

26  opinion was ambiguous and equivocal.  Dr. Jaffer's opinion does not support the statement

27  that MetLife made in the October 23, 2007 denial letter that: "According to the

28  [independent medical exam] physician [Dr. Jaffer] the claimant is capable of sedentary

1    work; therefore she is able to perform the essential tasks of her occupation as well." (ECF

2    No. 22-8 at 46).

3         After Watts appealed the denial, Dr. Payne performed a review of the medical record

4    and relied upon Dr. Jaffer's report stating: "The determination of the rheumatologist [Dr.

5    Jaffer] was that Ms. Watts was capable of full time sedentary work." (ECF No. 22-6 at 18).

6    On January 22, 2008, MetLife notified Watts that it was upholding the termination of her

7    long-term disability benefits. (ECF No. 22-5 at 35). MetLife explained that "an

8    independent medical examination performed by a rheumatologist [Dr. Jaffer] ... found

9    [Watts] capable of performing sedentary work ...." *Id.* at 36. MetLife's denial letter, Dr.

10   Payne's independent medical review, and MetLife's letter upholding the denial of benefits

11   on appeal do not address limitations that Dr. Jaffer placed on his opinion. MetLife's denial

12   letter, Dr. Payne's independent medical review, and MetLife's letter upholding the denial

13   of benefits on appeal cite to Dr. Jaffer's opinion as finding that Watts could perform

14   sedentary work. The Court finds that MetLife's denial letter, Dr. Payne's independent

15   medical review, and MetLife's letter upholding the denial of benefits were each based on

16   Dr. Jaffer's ambiguous or equivocal medical opinion. MetLife's reliance on an ambiguous

17   or equivocal medical opinion to deny Watts benefits weighs in favor of finding that

18   MetLife abused its discretion in terminating Watts's benefits.

19        In *Abatie*, the court stated that "[t]he level of skepticism with which a court views a

20   conflicted administrator's decision may be ... more heav[]y if, for example, the

21   administrator ... fails to credit a claimant's reliable evidence...." *Abatie*, 458 F.3d at 968

22   (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). In *Nord*, the

23   Supreme Court stated: "Plan administrators, of course, may not arbitrarily refuse to credit a

24   claimant's reliable evidence, including the opinions of a treating physician." *Nord*, 538

25   U.S. at 834. In this case, MetLife did not comment on the medical record or the opinion of

26   any of Plaintiff's treating physicians in its October 23, 2007, letter terminating Watts's

27   benefits. The only reference to Watts's medical record states as follows: "The medical

28   information reviewed to make this determination was extensive. A thorough review and

evaluation of all medical information received from you and your physicians, along with other documentation contained in your file. (sic)."  (ECF No. 22-8 at 44).  MetLife also did not comment on Plaintiff's medical record or the opinion of any of Plaintiff's treating physicians in its January 22, 2008 letter upholding the termination of benefits on appeal. The Court finds that Plaintiff submitted reliable evidence of disability.  The Court concludes that MetLife arbitrarily and unreasonably failed to credit this evidence. The Court concludes that MetLife's failure to credit reliable evidence is a factor the Court considers in determining the level of skepticism with which the Court views MetLife's decision to terminate Watts's benefits.

### D.   Surveillance

In *Montour*, the Court of Appeals for the Ninth Circuit concluded that the defendant's "bias infiltrated the entire administrative decisionmaking process, which leads us to accord significant weight to the conflict [of interest]."  *Montour*, 588 F.3d at 634.  In support of this conclusion, the court relied upon the district court's finding that the defendant "overstate[d] and over-relie[d] on surveillance of Plaintiff."  *Id*. at 633; *see also Beaty v. Prudential Ins. Co. of America*, 313 F. App'x 46, 49 (9th Cir. 2009) (explaining that a court should not draw an "insupportable inference" from surveillance footage or reports which indicates a plaintiff can perform normal daily activities by "failing to consider how these activities demonstrate that she can perform the duties of her occupation....").

In this case, MetLife relied on surveillance taken on three occasions, over a course of approximately 90 hours, which revealed Watts left her home for a total of 19 hours.  Dr. Jaffer found that: "[Watts] clearly is capable of daily activities of living.  She is functioning reasonably well in her environment according to the written transcripts of her surveillance." (ECF No. 22-9 at 14).  MetLife terminated Watts's benefits and stated,

> [s]urveillance conducted ... showed you driving and entering several businesses....[y]ou were found to be active, it was observed that you are able to walk and move about without using a cane, crutches, or other visible supporting device.  You did not have an abnormal gait, your walking was very fluid.  You had no problem negotiating stairs, had no problem getting in or out of a car.  You were able to carry

and lift a large box into your vehicle.  You were able to bend, stoop, squat with no apparent difficulty.

(ECF No. 22-8 at 46).  Dr. Payne noted that he reviewed video surveillance and that it showed "no evidence of restrictions or limitations on activities."  (ECF No. 22-6 at 18). MetLife stated in its letter upholding termination of benefits that the surveillance footage was one of the three reasons for MetLife's denial of benefits by stating, "Watts's benefits were terminated based on video surveillance that shows no evidence of restrictions or limitations of activities, an independent medical examination performed by a rheumatologist on July 17, 2007 [Dr. Jaffer] that found her capable of performing sedentary work and a vocational analysis that determined Ms. Watts's own occupation was sedentary."  (ECF No. 22-5 at 36).

The Court concludes that MetLife overstated the video surveillance by finding that Watts had no restrictions or limitations on her activities even though Watts remained inside of her home, out of view, for the majority of the surveillance period.  MetLife over-relied on the surveillance video because MetLife failed to consider how the brief activities observed during the surveillance period demonstrated that Watts could perform the duties of her occupation. MetLife failed to consider whether the activities observed were consistent with Watts's physician's opinions regarding her diagnoses and limitations.  The Court concludes that MetLife's treatment of the surveillance evidence is a factor the Court considers in determining the level of skepticism with which the Court views MetLife's decision to terminate Watts's benefits.

**E.      Social Security Award**

The Plan required Plaintiff to apply for Social Security disability benefits which the Plan could deduct from her payments if granted.  In *Montour*, the court stated:

> While ERISA plan administrators are not bound by the [Social Security Administration]'s determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was the product of a principled and deliberative reasoning process.  In fact, not distinguishing the SSA's contrary conclusion may indicate a failure to consider relevant evidence....

> Ultimately, Hartford's failure to explain why it reached a different conclusion than the SSA is yet another factor to consider in reviewing the

administrator's decision for abuse of discretion, particularly where, as here, a plan administrator operating with a conflict of interest requires a claimant to apply and then benefits financially from the SSA's disability finding.

588 F.3d at 635, 637 (quotation omitted).

On March 31, 2008, Watts was found to be disabled by the Social Security Administration with a disability onset date of July 28, 2005, and she was awarded retroactive benefits. On July 10, 2008, Watts's attorney submitted the Social Security award to MetLife and requested reconsideration of Plaintiff's claim which had been terminated and the termination had been upheld on January 8, 2008. On July 25, 2008, Watts's attorney submitted a letter to MetLife and again requested re-evaluation of Watts's entitlement to benefits. MetLife did not comment on whether or not Watts's award of Social Security Disability Benefits impacted MetLife's claim determination, but on October 10, 2008, November 21, 2008, February 11, 2009, MetLife requested reimbursement of overpayment in the amount of $22,189.32 due to the retroactive Social Security award. . The failure to consider Social Security Administration's award is a factor the Court may consider in reviewing MetLife's decision to terminate Watts's benefits for abuse of discretion.

### F.    Own Occupation

The insurer's vocational analysis should be performed in "a reasoned and deliberative fashion [regarding the tasks] the claimant actually does" before a determination is made regarding the material duties of the job. *Salz v. Standard Ins. Co.*, 380 Fed. App'x 723, 724 (9th Cir. 2010) (declining to determine whether the insurer's reliance on the Dictionary of Occupational Titles was appropriate). "[T]he application of the term, 'own occupation,' should be done generally, *i.e.*, that the evaluation of disability should be made in light of the usual duties of that occupation and not depend on *ad hoc* peculiarities of a specific job or the requirements of a particular employer who may require activities beyond that generally contemplated by the 'occupation.'" *Ehrensaft v. Dimension Works Inc. Long Term Disability Plan*, 120 F. Supp. 2d 1253, 1259 (D. Nev. 2000); *see also Schmidlkofer v. Directory Distributing Associates, Inc.,* 107 F. App'x 631, 633 (6th Cir. 2004). Reliance

on a job description as set forth in the Dictionary of Occupational Titles is appropriate where the job description "involve[s] comparable duties but not necessarily every duty." *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 272 (4th Cir. 2002).

In this case, Watts's own occupation was categorized in August 2006 as a financial analyst and classified as medium work because it involved lifting up to 50 pounds occasionally. Watts also provided a résumé in which she explained that she "[p]rovide[d] financial and programmatic support to client," "[a]ssist[ed] the program manager by providing administrative and financial support'" and was "[r]esponsible for myriad day-to-day accounting and bookkeeping procedures." (ECF No. 22-16 at 49). On May 9, 2007, MetLife contacted Watts's employer and obtained a verbal description of Watts's financial analyst position as follows: "[employee] worked 6-8 [hours] on computer, worked on excel spreadsheets, balanced books, occasional phone to research information, rarely, on occasion, [employee] would have to go to storage rooms for old records, therefore would have to life boxes to get to the old records." (ECF No. 22-2 at 6). On October 17, 2007, MetLife's denial letter stated that it contained a "summary of [MetLife's] Vocational Rehabilitation review...." (ECF No. 22-8 at 45). Watts's own occupation was reclassified to sedentary work and MetLife applied the DOT job title of administrative assistant.

The Court finds that MetLife performed a reasoned and deliberative vocational analysis regarding the tasks that Watts performed before determining the material duties of her job. The Court concludes that the determination that Plaintiff's own occupation was sedentary work was reasonable under this record and is a factor that does not weigh in favor of finding that MetLife abused its discretion to terminate Watts's benefits.

### G.    Summary

The Court has reviewed and considered the entire administrative record. The Court has weighed all of the case-specific factors including the quality and quantity of the medical evidence which supports a finding that Watts was disabled; the lack of improvement in Watts's disability; the reliance by MetLife on Dr. Jaffer's ambiguous and equivocal medical opinion; and the reliance on an ambiguous and equivocal medical

opinion to support the denial letter, independent medical review, and letter upholding the denial of benefits.  The Court finds that MetLife abused its discretion in terminating Plaintiff's benefits.  In making its determination, the Court has viewed MetLife's decision with slight skepticism due to MetLife's conflict of interest, MetLife's failure to credit reliable evidence, and MetLife's treatment of the surveillance evidence.  However, even if the Court were to have conducted a "straightforward application of the abuse of discretion standard," *Montour*, 588 F.3d at 629, without consideration of the conflict of interest, the Court would nonetheless conclude that MetLife abused its discretion in terminating Plaintiff's benefits.

## III.   Remedy

In *Pannebecker*, the Ninth Circuit stated: "if an administrator terminates continuing benefits as a result of arbitrary and capricious conduct, the claimant should continue receiving benefits until the administrator properly applies the plan's provisions." *Pannebecker v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1213, 1221 (9th Cir. 2008).

In *Grosz-Salomon*, the Ninth Circuit stated: "[R]etroactive reinstatement of benefits is appropriate in ERISA cases where, as here, 'but for [the insurer's] arbitrary and capricious conduct, [the insured] would have continued to receive the benefits' ...." *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001) (quoting *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 477 (7th Cir. 1998); *Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 461 (9th Cir. 1996)); *see also Montour*, 588 F.3d at 637 (ordering "reinstatement of ... disability benefits in accordance with this opinion and the terms of the Plan.").

MetLife's decision to terminate Watts's "own occupation" benefits was an abuse of discretion.  The Court orders retroactive reinstatement of Watts's "own occupation" disability benefits from the time they were terminated in accordance with the terms of the Plan.  *See Montour*, 588 F.3d at 637; *Pannebecker*, 542 F.3d at 1221; *Grosz-Salomon*, 237 F.3d at 1163.  Pursuant to 29 U.S.C. § 1132(g), Plaintiff is entitled to recover "reasonable attorney's fees and costs."  29 U.S.C. § 1132(g)(1); *see also Hardt v. Reliance Standard*

1   *Life Ins. Co.*, __ U.S. __, 130 S.Ct. 2149, 2152 (2010).

2   **IV.**    **Counterclaim**

3      Defendant seeks reimbursement of overpayment in the amount of $22,189.32 due to

4   Plaintiff's retroactive Social Security award.

5      An ERISA plan fiduciary may seek equitable relief from a beneficiary.  29 U.S.C. §

6   1132(a)(3) ("A civil action may be brought ... by a participant, beneficiary, or fiduciary ...

7   to obtain other appropriate equitable relief...."); *see also Sereboff v. Mid Atlantic Medical*

8   *Services, Inc.*, 547 U.S. 356, 361 (2006).  An ERISA plan fiduciary must specifically

9   identify a particular fund to which it is entitled a portion.  *Sereboff,* 547 U.S. at 365; *see*

10   *also Dillard's Inc. v. Liberty Life Assur. Co. of Boston,* 456 F.3d 894, 901 (8th Cir. 2006)

11   (affirming district court's judgment awarding defendants of a portion of plaintiff's recovery

12   from the Social Security Administration).  However, an ERISA plan fiduciary may not

13   recover legal relief such as "the imposition of personal liability ... for a contractual

14   obligation to pay money." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204,

15   214, 221 (2002) (finding that where the beneficiary did not have possession of the funds

16   which were the subject of a reimbursement provision, recovery of future funds would result

17   in a legal rather than equitable recovery).

18      In this case, Watts states that she no longer has possession of the retroactive Social

19   Security award and the Court has not been provided any evidence to the contrary.  Thus,

20   the Social Security award is not an existing fund upon which to assert an equitable lien.

21   However, this Court has ordered retroactive reinstatement of Watts's "own occupation"

22   benefits from the time they were terminated to the time that the "own occupation" benefits

23   would have expired.  The retroactive reinstatement of benefits is an existing fund upon

24   which MetLife may assert an equitable lien.

25   **V.**    **Conclusion**

26      For the reasons stated above, the Court finds that MetLife abused its discretion by

27   terminating Watts's benefits under the "own occupation" standard.

28

IT IS HEREBY ORDERED that Watts's disability benefits under the "own occupation" standard shall be reinstated from the time they were terminated in accordance with the terms of the Plan.  MetLife is entitled to an equitable lien against the retroactive reinstatement of benefits in the amount of $22,189.32.  The parties shall submit a proposed judgment within thirty (30) days of the date of this order.  Plaintiff shall submit any request for attorney's fees and costs with documentation within sixty (60) days of the date of this order.

DATED:  April 26, 2011

**WILLIAM Q. HAYES**
United States District Judge